# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-10-00297-CV

---

**Appellants, Chester L. Slay, Jr., Individually; Union Texas Limited Partnership; and Chester L. Slay, Jr., Trustee of Peckham Family Trust//**
**Cross-Appellant, Texas Commission on Environmental Quality**

**v.**

**Appellee, Texas Commission on Environmental Quality//**
**Cross-Appellees, Chester L. Slay, Jr., Individually; Union Texas Limited Partnership; and Chester L. Slay, Jr., Trustee of Peckham Family Trust**

---

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
### NO. D-1-GN-07-003823, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

---

## O P I N I O N

These cross-appeals present two principal sets of issues: (1) whether a Texas Commission on Environmental Quality (TCEQ) order imposing administrative penalties withstands judicial review under the standard in section 2001.174 of the Administrative Procedure Act (APA), *see* Tex. Gov't Code Ann. § 2001.174 (West 2008), and (2) whether the district court possessed subject-matter jurisdiction over declaratory claims under section 2001.038 of the APA that were asserted alongside the claimants' suit for judicial review, *see id.* § 2001.038 (West 2008).[1] We conclude that the district court lacked subject-matter jurisdiction over the claims under

---

[1] The APA is codified in title 10, subtitle A, chapter 2001 of the Texas Government Code. *See* Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2008).

APA section 2001.038 and that there is no basis under APA section 2001.174 for reversing the agency's order.

**BACKGROUND**

**The Palmer Barge site**

The underlying dispute concerns a seventeen-acre tract located on the shores of Sabine Lake in what has been described as an "industrial" area of Port Arthur. Between 1982 and 1997, the tract was the site of a barge and marine vessel servicing and maintenance business operated by Palmer Barge Line, Inc. The business's primary operations included cleaning the engines, boilers, and holds of vessels with steam or water. Palmer Barge eventually went into bankruptcy and, in July 1997, ceased its servicing and maintenance operations. The following September, the seventeen-acre property was conveyed in a non-judicial foreclosure sale to one of the parties to these appeals, Union Texas Limited Partnership (Union Texas).

Remaining on the Palmer Barge site, in the wake of the business's demise, were a number of tanks and other structures containing substances that had been used or produced in the business's operations. As early as 1997, the federal Environmental Protection Agency (EPA) and TCEQ[2] had begun investigating the possible presence of hazardous wastes at several locations on the property, including both the man-made structures and some places where substances had ended up in the soil. As these investigations were continuing, on June 12, 1999, ownership of

_____

[2] This event and some others we recount actually involved TCEQ's predecessor agencies. For clarity, and because any distinctions are immaterial to our analysis, we will use "TCEQ" as shorthand for Texas's state environmental regulatory agencies in both their current and prior incarnations.

Union Texas—again, the owner of the Palmer Barge site since September 1997—was conveyed in its entirety to another party to these appeals, Chester L. Slay, Jr.[3]

Roughly two weeks thereafter, on June 24, 25, and 27, 1999, a TCEQ inspector, Raymond Marlow, conducted a compliance inspection at the Palmer Barge site. Marlow returned to the site on July 21. On that same day, Union Texas (again, now owned entirely by Slay) conveyed the Palmer Barge site, in varying portions, to Slay in his capacity as trustee for four different family trusts.[4] One of these trusts, the Peckham Family Trust, is a party to these appeals.

---

[3] To be precise, Slay was conveyed one-hundred percent of the stock in Union Capital Recovery Corporation (Union Capital). Union Capital, in turn, owned a ninety-nine percent share of the Union Texas limited partnership. Union Capital also held the remaining one percent of Union Texas indirectly through owning one-hundred percent of the stock of Nuggetman Corporation, which held the one-percent share of Union Texas as general partner. Thus, as of June 12, 1999, Slay was the indirect sole owner of the entirety of the Union Texas limited partnership that owned the Palmer Barge site.

Slay, who had been involved with a similar barge-servicing business on an adjacent property, would later testify that he had agreed to the conveyance to resolve a boundary dispute with former owners of the Palmer Barge site. He explained his willingness to enter into such a transaction despite the risks by claiming that he had been under treatment for non-Hodgkins' lymphoma (a form of cancer) at the time—an illness he attributed to benzene to which he had been exposed in his barge-servicing work—and that the illness and treatment had impaired both his physical strength and judgment. He also professed a belief that the site's owners had taken unfair advantage of him in luring him into taking the deal. However, the administrative law judge (ALJ) would make no findings to this effect, but would instead cite evidence that Slay was a sophisticated real estate investor who was familiar with both the Palmer Barge site and the environmental issues potentially associated with barge-cleaning businesses, having been assessed civil penalties by TCEQ for violations of environmental regulations by his own business during the 1980s. The ALJ would also find that Slay had planned to lease the Palmer Barge site to a third party that would use it for reconstruction of offshore oil platforms.

[4] The ALJ would later observe that interests related to Slay's own barge-servicing business had similarly been held in family trusts.

3

On July 23, 1999, a sampling operation was performed for TCEQ at the Palmer Barge site. The sampling detected benzene—a known carcinogen—in excess of 0.5 parts per million in the waters stored in fourteen on-site tanks and one roll-off container. Additional site visits by Marlow followed on August 4, October 20, and October 28, 1999. The October 20 visit was in conjunction with an EPA site visit. During the following month, the EPA would have the wastes removed from the tanks and containers at the site. The EPA would later designate the Palmer Barge site as a "Superfund" site in July of the following year.[5]

**Fallout**

In January 2000, TCEQ entered into an agreed order with a former owner of the Palmer Barge business and property that recited eighteen sets of violations of state and federal environmental regulations. These violations included allowing the discharge of contaminated storm water, failing to complete hazardous waste determinations for wastes in various tanks and containers, failing to label hazardous waste storage tanks and containers, failing to notify TCEQ of on-site waste management units, and failing to obtain a permit for the storage of hazardous wastes for more than ninety days. For all of these violations, the agreed order imposed a total penalty of $25,000.

Later, in September 2002, the EPA also issued a consent order against four responsible parties (none of whom is a party to this appeal) who had arranged for disposal or treatment of hazardous substances at the Palmer Barge site or who had selected the facility as a

---

[5] A Superfund site is a place considered a national priority for environmental remediation because of known or threatened releases of hazardous substances at that site. *See* 42 U.S.C.A. §§ 9601-9626 (West 1991) (Comprehensive Environmental Response, Compensation and Liability Act, commonly known as the Superfund law).

disposal site and transported hazardous substances to the facility. The responsible parties also agreed to assess and remediate the site.

Although the environmental problems at the Palmer Barge site predated their ownership or involvement, and they had not themselves generated or contributed to the wastes found there,[6] Union Texas, the Peckham Family Trust, and Slay were nonetheless targets of a TCEQ enforcement action based on, in essence, their alleged inaction.[7] TCEQ issued a notice of enforcement letter to Union Texas and the Peckham Family Trust on April 3, 2000. In June 2003, TCEQ's executive director issued a preliminary report and petition alleging regulatory violations

---

[6] TCEQ would later adopt the following ALJ findings concerning the responsibility of these three parties for the presence of the wastes found at the Palmer Barge site:

- "None of Respondents engaged in any active operations at the Facility."

- "Respondents did not build or actively operate any tanks, containers or other structures at the Facility."

- "All of the waste stored in the various tanks and containers were generated and stored by Palmer prior to his cessation of operations in 1997."

- "Respondents did not store any wastes other than those previously placed into the tanks and containers by Palmer."

- "The wastes that are the subject of this enforcement action against Respondents were stored between 1997 and June 12, 1999 [the date when Slay acquired Union Texas], by entities who are not respondents."

- "The stained soils identified by the Executive Director were present at the Facility in November 1997 [when Union Texas acquired ownership]."

- "The wastes in the tanks and containers identified by the Executive Director were present at the Facility in November 1997."

[7] TCEQ initially pursued three of the four family trusts that now owned the Palmer Barge site, but later dismissed all but the Peckham Family Trust.

not only by Union Texas and the Peckham Family Trust, as successive owners of the site, but also by Slay individually, as an "operator" of the site.[8] The prosecution would ultimately proceed to a contested-case hearing before an administrative law judge (ALJ) at the State Office of Administrative Hearings. At the hearing, Slay appeared pro se both on his own behalf and as representative of the two other respondents. Following the hearing, the ALJ determined that the respondents had committed five sets of regulatory violations:

(1) violating TCEQ rule 335.112(a)(9) and EPA rules 265.190-.202 by "failing to properly label, inspect, assess, certify, or provide secondary containment for 14 waste tanks";[9]

(2) violating water code section 26.121(a) and TCEQ rule 335.8(b) by "failing to conduct spill closure or remediation activities at 10 spill sites at the Facility";[10]

(3) violating TCEQ rule 335.62 and EPA rule 262.11 by "failing to perform hazardous waste determinations and waste classifications on 15 different wastes generated and stored in 15 different containers at the Facility";[11]

(4) violating TCEQ rule 335.6(c) by "failing to notify TCEQ concerning the storage of industrial waste at the Facility in the northwest slop oil tank, the northeast slop oil tank, a container at the dock and a fresh water tank";[12] and

---

[8] *See* 30 Tex. Admin. Code § 335.1(103) (2011) (Texas Comm'n on Envtl. Quality, Definitions).

[9] *See id.* § 335.112(a)(9) (2011) (Texas Comm'n on Envtl. Quality, Standards); 40 CFR §§ 265.190-.220 (2011).

[10] *See* Tex. Water Code Ann. § 26.121(a) (West 2008); 30 Tex. Admin. Code § 335.8(b) (2011) (Texas Comm'n on Envtl. Quality, Closure and Remediation).

[11] *See* 30 Tex. Admin. Code § 335.62 (2011) (Texas Comm'n on Envtl. Quality, Hazardous Waste Determination and Waste Classification); 40 C.F.R. § 262.11 (2011).

[12] *See* 30 Tex. Admin. Code § 335.6(c) (2011) (Texas Comm'n on Envtl. Quality, Notification Requirements).

(5)      violating TCEQ rule 335.2 and EPA rule 270.1 by "failing to obtain a permit to store, in 14 waste tanks at the Facility, hazardous waste generated on-site."[13]

TCEQ adopted these findings.

Union Texas, the Peckham Family Trust, and Slay do not challenge these liability findings on appeal. Their focus is instead on the monetary penalties that TCEQ imposed against them for the violations.

**Penalties**

*Standards and criteria*

Where such violations are found, the Legislature has delegated discretion to TCEQ to impose administrative penalties up to a maximum amount of $10,000 per day for each day of violation. *See* Tex. Water Code Ann. § 7.051(c), (d) (West 2008). When TCEQ exercises this discretion, however, the Legislature has directed that the agency "shall consider":

(1)      the nature, circumstances, extent, duration, and gravity of the prohibited act, with special emphasis on the impairment of existing water rights or the hazard or potential hazard created to the health or safety of the public;

(2)      the impact of the violation on:

      (A)     air quality in the region;

      (B)     a receiving stream or underground water reservoir;

---

[13] *See id.* § 335.2 (2011) (Texas Comm'n on Envtl. Quality, Permit Required); 40 C.F.R. § 270.1 (2011).

       (C)     instream uses, water quality, aquatic and wildlife habitat, or beneficial freshwater inflows to bays and estuaries; or

       (D)     affected persons;

  (3)    with respect to the alleged violator:

       (A)     the history and extent of previous violations;

       (B)     the degree of culpability, including whether the violation was attributable to mechanical or electrical failures and whether the violation could have been reasonably anticipated and avoided;

       (C)     the demonstrated good faith, including actions taken by the alleged violator to rectify the cause of the violation and to compensate affected persons;

       (D)     economic benefit gained through the violation; and

       (E)     the amount necessary to deter future violations; and

  (4)    any other matters that justice may require.

*Id.* § 7.053 (West 2008). At the center of this appeal is a September 2002 document, prepared by TCEQ's enforcement division, that sets forth an elaborate methodology for applying these statutory criteria. The document is titled, "Penalty Policy of the Texas Commission on Environmental Quality" (hereinafter "Penalty Policy").

The introduction to the Penalty Policy advises that the document's purpose is to "describe the policy of [TCEQ] regarding the computation and assessment of administrative penalties." It then explains:

> This document does not address when an enforcement action is initiated, but rather how TCEQ staff are to evaluate violations for the purpose of recommending administrative penalties to the commission.

8

> This policy includes a description of how violations are evaluated in terms of harm and severity and how any proposed penalties are determined. It includes a discussion of what adjustments may be made to the base penalty amount after the review of case-specific information and information concerning the respondent.

The document then sets forth a process for determining specific recommended penalty amounts that consists of three basic steps or sets of steps: (1) determining a "base" penalty amount with respect to each regulation found to have been violated; (2) determining the number of "violation events"; and (3) determining whether adjustments to the penalty are warranted based on specific characteristics of the violator or the underlying conduct.

In the first step, the base penalty amount is calculated by multiplying the maximum penalty amount for violating the regulation at issue by a percentage derived from either of two matrices. For violations that harm or have the potential to harm the environment or human health, the matrix specifies a percentage that depends upon whether a release or discharge is actual or merely potential; whether the extent of harm that would be caused by the release is "major," "moderate," or "minor;" and whether the source is considered "major" or "minor." In general, the applicable percentages are higher for actual as opposed to potential discharges, major versus minor harm, and major versus minor sources. The other matrix applies to violations of documentation or "programmatic" requirements and similarly prescribes ranges of percentages tied to the perceived severity of the violation or consequences thereof, with generally higher percentages imposed for greater severity.

Once the base penalty is determined, the next step is to determine the number of "violation events." According to the 2002 Penalty Policy, this is not simply a qualitative assessment,

9

but "depends on the number of times the violation is observed, the specific requirement violated, the duration of the violation, and other case information." "Discrete events," those involving "practices or actions that do not occur continuously," are assessed as "one penalty event . . . for every documented observation of noncompliance." In contrast, "continuing" violations "are not constrained by documented observations of noncompliance," and examples include "groundwater contamination, unauthorized discharges/releases, . . . [and] operating without a required permit." With continuing violations, the number of violations assessed depends in part on their harm or severity, with "major" violations being "counted" as often as daily, "minor" violations counted as often as quarterly, and "moderate" violations being counted as often as monthly. The beginning date of the violation, the Policy further explains, may be "the initial date of noncompliance" and will end when the respondent either "returned to compliance or the enforcement screening date, whichever is appropriate."

Once the number of violation events is determined, that number is multiplied by the corresponding violation base penalty to yield a "violation base penalty." From there, amounts may be added or subtracted from the subtotal based on several separate factors: (1) upward adjustment for negative "compliance history"; (2) upward adjustment if the respondent is classified as a "repeat violator"; (3) upward adjustment for "culpability," i.e., whether the respondent could have anticipated and avoided the violation; (4) downward adjustment if the respondent made good-faith efforts to return the site to compliance; (5) upward adjustment if the respondent obtained greater than $15,000 in economic gain from its violation; and (6) downward adjustment if the respondent's compliance history "performance" is "high" and upward if it is "poor" (and neither if it is "average").

10

Where the conditions for making any such adjustments are met, the adjustment amount is determined by multiplying a specified percentage times the amount of the violation base penalty. After making any such adjustments, the penalty is then subject to a further percentage adjustment based on "other factors that justice may require," if any, to yield the final penalty amount. The final figure that results is then compared to the statutory range of penalty amounts for violating the regulation and adjusted as necessary to ensure that the penalty amount does not exceed the per-day maximum penalty or fall below any statutorily specified minimum amount.

### *Application*

Based on an application of the Penalty Policy, TCEQ's executive director sought to impose a total penalty of $596,625 on Union Texas, the Peckham Family Trust, and Slay, jointly and severally. The executive director presented evidence detailing the underlying calculations, including a series of completed "worksheets" or forms that the agency staff apparently uses for such purposes. To summarize these calculations, the executive director ascertained that the applicable maximum daily penalty for each of the five sets of regulatory violations was $10,000, and then determined the violation base penalty for each as follows:

- For violating TCEQ rule 335.112(a)(9) and EPA rules 265.190-.202 ("failing to properly label, inspect, assess, certify or provide secondary containment for 14 waste tanks"), the executive director determined that the per-violation base penalty was 50 percent of the daily maximum penalty, or $5,000. This figure was then multiplied by ten, representing a determination that the respondents should be charged with ten months of continuing violations (roughly corresponding to the period between the June 1999 inspections and April 2000). The product, $50,000, was then multiplied by four, representing the executive director's determination that the monthly violations had occurred in four separate areas of the Palmer Barge site. The latter calculation yielded a violation base penalty of $200,000.

11

- For violating water code section 26.121(a) and TCEQ rule 335.8(b) ("failing to conduct spill closure or remediation activities at 10 spill sites at the Facility"), the executive director determined that the per-violation base penalty was 50 percent of the daily maximum, or $5,000. This amount was then multiplied by ten—again, apparently representing ten months of continuing violations charged on a monthly basis—to yield a violation base penalty of $50,000.

- For violating TCEQ rule 335.62 and EPA rule 262.11 ("failing to perform hazardous waste determinations and waste classifications on 15 different wastes generated and stored in 15 different containers at the Facility"), the executive director determined that the per-violation base penalty was 25 percent of the daily maximum, or $2,500. This figure was then multiplied by fifteen (for fifteen locations where the violations occurred), yielding a violation base penalty of $37,500.

- For violating TCEQ rule 335.6(c) ("failing to notify TCEQ concerning the storage of industrial waste at the Facility in the northwest slop oil tank, the northeast slop oil tank, a container at the dock and a fresh water tank"), the executive director determined that the per-violation base penalty was 25 percent of the daily maximum, or $2,500. This figure was then multiplied by four (representing the four waste management units where the violations occurred) to yield a violation base penalty of $10,000.

- For violating TCEQ rule 335.2 and EPA rule 270.1 ("failing to obtain a permit to store, in 14 waste tanks at the Facility, hazardous waste generated on-site"), the executive director determined that the per-violation base penalty was 25 percent of the daily maximum, or $2,500. This figure was then multiplied by ten (representing ten months of a continuing violation charged on a monthly basis) to yield a violation base penalty of $25,000.

The total of these violation base penalties was $322,500. The executive director then enhanced this amount by another thirty-five percent ($112,875). Twenty-five percent of this adjustment was based on an adverse "compliance history" for the Palmer Barge site; the other ten percent was added for the respondents' own purportedly "poor" compliance history. The executive director also added an upward percentage adjustment of fifty percent of the total base penalty amount ($161,250) based on what was determined to be $2.9 million in economic benefits that respondents obtained from

12

noncompliance. No other adjustments were made. Adding the two sets of enhancements to the total of the violation base penalties brought the total penalty amount to the $596,625 figure that the executive director sought.[14]

The ALJ, in stark contrast, recommended that a total penalty of only $1,500 be imposed against the respondents, jointly and severally. The ALJ found that the penalty calculation worksheets underlying the executive director's recommended penalties "contain[ed] errors, unproven assumptions, and unproven bases." Based on his own application of the Penalty Policy, the ALJ concluded that each of the five regulatory violations was properly considered "only on a Facility-wide basis," thereby rejecting the executive director's use of multipliers where the same regulatory violation was found to have occurred at more than one location within the site. The ALJ similarly concluded that each regulatory violation should properly be considered a single violation event, not ten events of continuing monthly violations, as the executive director had proposed with respect to three of the violations. The ALJ further rejected the executive director's proposed upward adjustments to the total violation base penalties. Instead, the ALJ concluded that, "[b]ased on the facts and circumstances peculiar to this case," the only violations that should be penalized were respondents' infringement of TCEQ rule 335.6(c), in the amount of $1,000, and TCEQ rule 335.2 and EPA rule 270.1, in the amount of $500, yielding the $1,500 total penalty.

In the final penalty determination made by its commissioners, TCEQ modified the ALJ's penalty recommendations as follows:

---

[14] The executive director also presented evidence of an alternative set of calculations to support imposition of separate penalties in the amounts of $212,750 against the Peckham Family Trust, $471,750 against Union Texas, and $596,625 (the same amount as the proposed joint-and-several penalty) against Slay individually.

13

• TCEQ agreed that the executive director's penalty calculations had been flawed, but modified the ALJ's finding of "errors, unproven assumptions, and unproven bases" to state simply that the calculations had "inaccurately reflect[ed] the number of violation events for continuing and programmatic violations." In its order, TCEQ explained that "although the ED did have some inaccuracies in the penalty calculation worksheet, there were not unproven assumptions and bases."

• TCEQ deleted the ALJ's conclusion that each of the five regulatory violations was properly considered "only on a Facility-wide basis," explaining that "the Penalty Policy provides for penalties for each discrete area of violation, and there were separate and discrete areas at the site."

• TCEQ modified the ALJ's conclusions that each regulatory violation had been a single violation event to reflect that, consistent with the executive director's recommendation, three had been continuing monthly violation events. However, differing from the executive director, the Commission determined that only five months of monthly penalties should be imposed for each such violation, corresponding to the period between the June 1999 site inspection to EPA's removal actions in November 1999.

• TCEQ then modified the ALJ's conclusions regarding penalty amounts to impose the following penalties "based on the facts and circumstances peculiar to this case":

    • For violating TCEQ rule 335.112(a)(9) and EPA rules 265.190-.202 ("failing to properly label, inspect, assess, certify or provide secondary containment for 14 waste tanks"), $100,000. This figure corresponds to the $200,000 violation base penalty calculated by the executive director but with only five months of continuing monthly violations charged rather than ten.

    • For violating water code section 26.121(a) and TCEQ rule 335.8(b) ("failing to conduct spill closure or remediation activities at 10 spill sites at the Facility"), $25,000. This figure, like the preceding one, corresponds to the $50,000 violation base penalty calculated by the executive director, but with only five months of continuing monthly violations charged rather than ten.

    • For violating TCEQ rule 335.62 and EPA rule 262.11 ("failing to perform hazardous waste determinations and waste classifications on 15 different wastes generated and stored in 15 different containers at the Facility"), $37,500. This amount is the same as the violation base penalty recommended by the executive director.

    • For violating TCEQ rule 335.6(c) ("failing to notify TCEQ concerning the storage of industrial waste at the Facility in the northwest slop oil tank, the northeast slop oil tank, a container at the dock and a fresh water tank"), $2,500. This figure

14

corresponds to the $10,000 violation base penalty calculated by the executive director but without multiplying the per-violation base penalty ($2,500) by four to reflect the number of areas implicated.

- Finally, for violating TCEQ rule 335.2 and EPA rule 270.1 ("failing to obtain a permit to store, in 14 waste tanks at the Facility, hazardous waste generated on-site"), $12,500. This figure corresponds to the $25,000 violation base penalty calculated by the executive director but with only five months of continuing monthly violations charged rather than ten.

The total of these penalties was $177,500, which TCEQ imposed on the respondents jointly and severally.

Union Texas, the Peckham Family Trust, and Slay filed a motion for rehearing that was overruled by operation of law.

**Proceedings below**

After their motion for rehearing was overruled, Union Texas, the Peckham Family Trust, and Slay (collectively, the Plaintiffs) filed suit against TCEQ and its executive director, in his official capacity (collectively, the State Defendants). The Plaintiffs asserted two claims that are predicated on statutory waivers of the State Defendants' sovereign immunity.[15] The first was a claim seeking judicial review of TCEQ's order under subchapter G of the APA. *See* Tex. Gov't Code Ann. §§ 2001.171-.178 (West 2008).[16] The second was a parallel claim under APA section 2001.038 for

---

[15] *See, e.g.*, *Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853-54 (Tex. 2002) (holding that sovereign immunity generally bars suits against the state, its agencies, or officials in official capacity).

[16] *See Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 198 (Tex. 2004) (observing that APA waives sovereign immunity to permit judicial-review claims against agencies); *see also Continental Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 397 (Tex. 2000) ("It is well recognized under Texas law that there is no right to

a declaration invalidating what Plaintiffs alleged to be a TCEQ "rule"—the 2002 Penalty Policy—on the basis that the agency had adopted it without complying with the APA's notice-and-comment requirements. *See id.* § 2001.038(a);[17] *see also* Tex. Gov't Code Ann. §§ 2001.023-.033, .035 (West 2008) (notice-and-comment rule-making requirements); *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008) (invalidating agency "rule" for noncompliance with these requirements).

The State Defendants filed a plea to the jurisdiction contesting the district court's subject-matter jurisdiction over the Plaintiffs' APA section 2001.038 claim. They relied on their sovereign immunity from suit and the assertion that Plaintiffs had failed to invoke section 2001.038's waiver of immunity for two reasons. First, the State Defendants argued that section 2001.038 authorizes suits solely for prospective declaratory relief before an agency rule is applied to a party, and is unavailable where, as here, the rule has already been applied to a party in an agency proceeding that has been concluded by a final order. Second, the State Defendants urged that the 2002 Penalty Policy was not a "rule" within the meaning of the APA, so as to be subject to challenge via section 2001.038. Consequently, the State Defendants further reasoned, the Plaintiffs' sole conceivable remedy with respect to their rule-invalidity complaint would have been through TCEQ's contested-case hearing process and judicial review, subject to the exhaustion-of-remedies and error-

---

judicial review of an administrative order unless a statute provides a right or unless the order adversely affects a vested property right or otherwise violates a constitutional right.") (citing *Stone v. Texas Liquor Control Bd.*, 417 S.W.2d 385, 385-86 (Tex. 1967)).

[17] *See also Texas Logos, L.P. v. Texas Dep't of Transp.*, 241 S.W.3d 105, 123 (Tex. App.—Austin 2007, no pet.) (holding that "section 2001.038 is a grant of original jurisdiction and, moreover, waives sovereign immunity").

preservation requirements applicable in that context. *See* Tex. Gov't Code Ann. §§ 2001.145, .171 (West 2008) (providing that failure to include complaint in motion for rehearing waives complaint because motion for rehearing is judicial prerequisite to appeal); *Public Utils. Comm'n of Tex. v. Cities of Harlingen*, 311 S.W.3d 610, 623 (Tex. App.—Austin 2010, no pet.) (citing *Gonzalez v. Texas Educ. Agency*, 882 S.W.2d 526, 528 (Tex. App.—Austin 1994, no writ)).

The district court carried the plea through trial. Trial was to the bench, conducted in what our record reflects was the manner contemplated by section 2001.175 of the APA, with the evidence limited to the agency record. *See* Tex. Gov't Code Ann. § 2001.175. Following trial, the district court rendered judgment denying the State Defendants' plea to the jurisdiction and finding that "it has jurisdiction of Plaintiffs' declaratory judgment cause of action under [APA] § 2001.038." On the merits of that claim, however, the court rendered judgment "that the Penalty Policy of TCEQ that went into effect September 1, 2002, is not a rule and TCEQ was not required to comply with the rule making requirements set forth in APA §§ 2001.0225-.034 for the Penalty Policy to be valid." Accordingly, the district court did not grant Plaintiffs relief on their section 2001.038 claim. As for the Plaintiffs' judicial-review claim, the district court rendered judgment that TCEQ's final order "is supported by substantial evidence and should be affirmed in all respects."

The district court subsequently entered findings of fact and conclusions of law. Both the Plaintiffs and the State Defendants filed notices of appeal.

**ANALYSIS**

On appeal, the parties join issue with respect to the judgment's disposition of both of Plaintiffs' claims.

17

**Section 2001.038 claim**

In their second of three issues on appeal, Plaintiffs assert that the district court erred in holding that the 2002 Penalty Policy was not a "rule" under the APA. While agreeing with the court's holding that the Penalty Policy was not a "rule," the State Defendants urge that the district court erred in purporting to reach that issue in the guise of deciding the merits of Plaintiffs' section 2001.038 claim. In their second of two issues on appeal, the State Defendants argue that the question of whether the Penalty Policy is a "rule" instead goes to the district court's subject-matter jurisdiction over the claim—specifically, whether Plaintiffs had stated a claim within section 2001.038's waiver of sovereign immunity—such that the district court should have dismissed the claim for want of jurisdiction upon concluding that the Policy was not a "rule." In their first appellate issue, the State Defendants assert the broader contention that a section 2001.038 claim does not lie where, as here, the challenged "rule" has already been applied as a basis for a final agency order. In such instances, the State Defendants insist, a clamaint's sole remedy with respect to their rule challenge would be judicial review (if the Legislature has provided it) from the final agency order, subject to the principles that govern exhaustion of remedies and error preservation in that context. Responding to these assertions in what they style as their first issue on appeal, Plaintiffs argue, in part, that they properly invoked the district court's subject-matter jurisdiction under section 2001.038.

We will begin by addressing whether the district court possessed subject-matter jurisdiction over Plaintiffs' section 2001.038 claim. A plea to the jurisdiction challenges a trial court's authority to decide the subject matter of a specific cause of action. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004). Analysis of whether this

18

authority exists begins with the plaintiff's live pleadings. *Id*. at 226. The plaintiff has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). Mere unsupported legal conclusions do not suffice. *See Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 515-16 & nn.7-8 (Tex. App.—Austin 2010, no pet.). We must also consider evidence the parties presented below that is relevant to the jurisdictional issues, *Bland Independent School District v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000), including evidence that a party has presented to negate the existence of facts alleged in the plaintiff's pleading. *See Miranda*, 133 S.W.3d at 227; *see also Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 719 (Tex. App.—Austin 2009, no pet.) (summarizing different standards governing evidentiary challenges to the existence of pleaded jurisdictional facts where such facts implicate both jurisdiction and the merits versus where they implicate only jurisdiction). Our ultimate inquiry is whether the plaintiff's pleaded and un-negated facts, taken as true and liberally construed with an eye to the pleader's intent, would affirmatively demonstrate a claim or claims within the trial court's subject-matter jurisdiction. *See Miranda*, 133 S.W.3d at 226; *Creedmoor-Maha*, 307 S.W.3d at 513, 516 n.8. This is a question of law that we review de novo. *See Miranda*, 133 S.W.3d at 226; *Creedmoor-Maha*, 307 S.W.3d at 513, 516 n.8.

In APA section 2001.038, the Legislature has waived sovereign immunity to the extent of creating a cause of action for declaratory relief regarding the "validity" or "applicability" of a "rule," as defined under the Act, if "it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't Code Ann. § 2001.038(a); *see Texas Logos, L.P. v. Texas Dep't of*

19

*Transp.*, 241 S.W.3d 105, 123 (Tex. App.—Austin 2007, no pet.) (holding that "section 2001.038 is a grant of original jurisdiction and, moreover, waives sovereign immunity"). From the face of the statute, a challenged agency action that constitutes a "rule" is among the facts (more precisely, a mixed question of law and fact) that must exist in order for a claimant to successfully invoke, via section 2001.038, a trial court's subject-matter jurisdiction over the claim for relief authorized by the statute. *See, e.g.*, *Combs v. City of Webster*, 311 S.W.3d 85, 100-01 (Tex. App.—Austin 2009, pet. denied) (recognizing that "[t]o the extent that no rule as defined by the APA is at issue, section 2001.038 does not provide any basis for the district court's jurisdiction over appellees' declaratory judgment action"). If there is no "rule as defined by the APA" being challenged, in other words, the claimant cannot obtain the declaratory relief the statute authorizes against the State, its agencies, or its agents, because sovereign immunity would bar the cause of action. *See id.*; *see also Texas Dep't of Transp. v. Sunset Transp., Inc.*, No. 03-10-00023-CV, 2011 WL 3659120, at *9-10 (Tex. App.—Austin Aug. 19, 2011, no pet. h.).

In arguing otherwise, Plaintiffs seem to view such a holding as effectively insulating all but formally promulgated rules from challenge under section 2001.038. As Plaintiffs observe, such a holding would run counter to cases recognizing that informal agency statements can be "rules" and be successfully challenged under APA section 2001.038. *See, e.g.*, *El Paso Hosp. Dist.*, 247 S.W.3d at 714-15; *Entertainment Publ'ns, Inc.*, 292 S.W.3d at 720-22; *Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex.*, 997 S.W.2d 651, 657-58 (Tex. App.—Austin 1999, pet. dism'd w.o.j.). But such expressed concerns miss the point, which is simply that whether or not the challenged agency action is a "rule" is one of the variables that

20

controls whether the trial court has subject-matter jurisdiction to entertain such a challenge by virtue of section 2001.038. *See City of Webster*, 311 S.W.3d at 100-01.

Relatedly, the Plaintiffs also seem to complain that treating the "rule" question as part of the jurisdictional inquiry is improper because it overlaps or delves into the merits. They urge that "the court would have to decide—before hearing Mr. Slay's appeal—that the Commission's Penalty Policy was not a 'rule' under the APA, and, therefore, that its validity could not be challenged through § 2001.038." As an initial matter, we question whether the "rule" issue overlaps the merits of Plaintiffs' section 2001.038 claim, at least under the circumstances of this case. Whether or not the 2002 Penalty Policy is a "rule" is distinct from and precedes the issue of whether Plaintiffs are entitled to prevail on the merits of their claim for relief—a declaration that this "rule" is invalid because it was not promulgated in accordance with the APA's notice-and-comment procedures. *See* Tex. Gov't Code Ann. § 2001.038(a). In this respect, the "rule" issue is thus similar to the antecedent question of whether a claimant has a "legal right or privilege" that can give rise to standing to sue under section 2001.038. *See id.*; *see also State v. BP Am. Prod. Co.*, 290 S.W.3d 345, 362-63 (Tex. App.—Austin 2009, pet. denied) (distinguishing this threshold standing question from the merits of a section 2001.038 claim, and holding that section 2001.038's waiver does not extend to antecedent determination of property rights on which standing would depend). But even if the questions did overlap, *Miranda* and its progeny have made clear that this is no bar to courts reaching the jurisdictional issue, *see Miranda*, 133 S.W.3d at 227; *Creedmoor-Maha*, 307 S.W.3d at 516 n.8 (quoting *Hendee v. Dewhurst*, 228 S.W.3d 354, 368-69 (Tex. App.—Austin 2007, pet. denied)); *see also Miranda*, 133 S.W.3d at 227 (further emphasizing that jurisdictional issues should be resolved "as soon as practicable"), although the existence of such overlap may impact

21

the procedures courts use when examining jurisdictional evidence, as previously observed. *See Entertainment Publ'ns, Inc.*, 292 S.W.3d at 719.

In sum, if the district court correctly determined that the 2002 Penalty Policy is not a "rule" as defined in the APA, we agree with the State Defendants that the court would have erred in purporting to assert jurisdiction over Plaintiffs' section 2001.038 claim. We turn to that question now. A "rule" under the APA:

(A)    means a state agency statement of general applicability that:

   (i)    implements, interprets, or prescribes law or policy; or
   (ii)   describes the procedure or practice requirements of a state agency;

(B)    includes the amendment or repeal of a prior rule; and

(C)    does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

Tex. Gov't Code Ann. § 2001.003(6) (West 2008). We need only consider the implications of subpart (C).

Although the distinction between a "rule" and an agency statement that concerns only "internal management or organization . . . and not affecting private rights" may sometimes be elusive,[18] the core concept is that the agency statement must in itself have a binding effect on private parties. *See Texas Dep't of Safety v. Salazar*, 304 S.W.3d 896, 905 (Tex. App.—Austin 2009, no pet.) ("Agency statements that 'have no legal effect on private persons' are not considered rules.")

---

[18]    *See, e.g.*, Ron Beal, *Substantive and Interpretive Rules: The Judiciary Continues to Struggle to Define Them and to Determine Their Legal Validity and Effect*, 12 Tex. Tech Admin. L.J. 55, 59-72 (2010) (summarizing some of this Court's more recent struggles with the distinction).

(quoting *Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 764, 770 (Tex. App.—Austin 1999, no pet.)); *Entertainment Publ'ns, Inc.*, 292 S.W.3d at 722 (emphasizing that legal interpretation in Comptroller's letters would bind agency employees and "unambiguously express[ed] an intent to apply this interpretation . . . in all future cases" involving similar facts); *see also Amusement & Music Operators of Tex.*, 997 S.W.2d at 658 (where there was evidence that agents "not only intend to enforce, but have enforced administrative sanctions" in accordance with agency's memoranda, trial court did not abuse its discretion in granting temporary injunction predicated on findings and conclusions that memoranda were "rules" under APA).

Regarding this criterion, Plaintiffs alleged in their petition that the Penalty Policy "has a binding effect on Plaintiffs who are private parties" and that the Policy "determines the amount of the penalty assessed against that entity and/or defendant." There was also evidence before the district court—including the text of the Policy itself—that TCEQ staff was required to follow the Penalty Policy's methodology in determining penalty recommendations. And the executive director purported to do just that, as we have previously detailed. Moreover, the penalties ultimately imposed by the TCEQ commissioners were in amounts consistent with the violation base penalties the executive director had recommended, adjusted for differences in the multipliers used (i.e., "counting" five rather than ten months of continuing monthly violations and one rather than four violations of TCEQ rule 335.6(c)). But what ultimately matters is that the district court also had evidence to the effect that the TCEQ commissioners were not *bound* to follow the Penalty Policy's methodology when exercising their legislatively conferred discretion to impose penalties.

The introductory section of the Penalty Policy states that the Policy's purpose is to explain "how TCEQ staff are to evaluate violations for the *purpose of recommending administrative*

23

*penalties to the commission.*" (Emphasis added.) The nature of the Penalty Policy is further illuminated by the following TCEQ rule:

> The executive director may use enforcement guidelines that are neither rules nor precedents, but rather announce the manner in which the agency expects to exercise its discretion in future proceedings. These guidelines do not establish rules which the public is required to obey or with which it is to avoid conflict. These guidelines do not convey any rights or impose any obligations on members of the public. These guidelines are available to the public under the terms of the Public Information Act, Texas Government Code, Chapter 552.

30 Tex. Admin. Code § 70.3 (2011) (Texas Comm'n on Envtl. Quality, Enforcement Guidelines). The Penalty Policy would appear to be an "enforcement guideline" within the meaning of this rule.

Relying on such authorities and evidence, the district court made the following findings of fact (also styled in the alternative as conclusions of law) relevant to the nature and effect of the Penalty Policy:

3. In the contested case proceeding before the TCEQ, held at the State Office of Administrative Hearings, the Executive Director used the TCEQ Penalty Policy to calculate the amount of administrative penalties to request.

4. The final assessment of administrative penalties against [Plaintiffs] was based on the decision of the three TCEQ Commissioners.

. . . .

9. The TCEQ Penalty Policy is an agency statement regarding the internal management of the TCEQ.

. . . .

12. The TCEQ Penalty Policy does not affect private rights.

24

13. The TCEQ Penalty Policy addresses how TCEQ staff are to evaluate violations for the purpose of recommending administrative penalties to the Commissioners.

14. The TCEQ Penalty Policy was designed by the TCEQ's enforcement division to promote the consistent calculation of administrative penalties by ensuring that administrative penalties requested by the Executive Director staff are calculated in a uniform way.

15. The TCEQ Penalty Policy allows the TCEQ to function effectively by producing clarity in the assessment of administrative penalties through the promotion of internal consistency in the application of the administrative penalty statutes.

16. TCEQ's Rule 70.3 provides:

    The executive director may use enforcement guidelines that are neither rules nor precedents, but rather announce the manner in which the agency expects to exercise its discretion in future proceedings. These guidelines do not establish rules which the public is required to obey or with which it is to avoid conflict. These guidelines do not convey any rights or impose any obligations on members of the public. These guidelines are available to the public under the terms of the Public Information Act, Texas Government Code, Chapter 552. *See* 30 Tex. Admin. Code § 70.3.

17. A preponderance of the evidence showed that the TCEQ Penalty Policy is not a rule.

The evidence reasonably supports these findings. The findings are also proper procedurally. Although the district court made these findings regarding the "rule" question in the evident belief that the issue went to the merits of Plaintiffs' section 2001.038 claim, the findings are also proper and controlling in determining the jurisdictional issue. *See Entertainment Publ'ns, Inc.*, 292 S.W.3d at 719; *see also Miranda*, 133 S.W.3d at 227-28 (noting that jurisdictional issue may be resolved after trial); *Director of the Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.*, 600 S.W.2d 264 (Tex. 1980) (deciding jurisdictional issue following trial).

Plaintiffs suggest that it suffices that the TCEQ commissioners imposed penalties that were largely consistent with the recommendations that the executive director derived from the Penalty Policy. They insist that this decision amounts to "enforcement" of the Penalty Policy so as to impact their private rights. *See Brinkley*, 986 S.W.2d at 770 ("[The] statutory exclusion [for statement regarding internal management or organization of a state agency and not affecting private rights or procedures] encompasses any agency statement regarding 'law,' 'policy,' or procedural 'requirements' made outside the rulemaking and contested-case context: such statements have no legal effect on persons absent . . . some attempt by the agency to enforce its statement against a private person . . . . At that point, an affected person may challenge, if he wishes, the validity or applicability of the agency statement on whatever grounds may be applicable."). We conclude that the record supports the distinction the district court drew between internal agency matters governed by the Penalty Policy and the TCEQ commissioners' ultimate exercise of their statutory discretion.

Concluding that the district court did not err in determining that the 2002 Penalty Policy was not a "rule" as defined in the APA but erred in purporting to exercise subject-matter jurisdiction over Plaintiffs' section 2001.038 claims, we sustain the State Defendants' second issue and overrule Plaintiffs' second issue and, in pertinent part, their first issue. We need not reach the State Defendants' first issue. *See* Tex. R. App. P. 47.1.

**Judicial-review claim**

We now turn to the appellate issues challenging the portion of the district court's judgment addressing Plaintiffs' judicial-review claim, all of which were raised by Plaintiffs. Within their first issue, Plaintiffs argue that even if their section 2001.038 claim is jurisdictionally barred,

26

they had invoked the district court's jurisdiction to address that complaint via their judicial-review claim and were entitled to relief. We need go no further than to observe that our disposition of Plaintiffs' second issue forecloses this argument. Consequently, we overrule this portion of Plaintiffs' first issue.

In their third issue, Plaintiffs challenge TCEQ's order assessing administrative penalties against them. Specifically, Plaintiffs argue that (1) the penalties assessed for unauthorized storage of solid wastes and hazardous wastes are not supported by evidence that the stored materials were, in fact, "waste"; (2) TCEQ's use of the 2002 Penalty Policy to assess fines for violations occurring in 1999 is an unlawful, retroactive application of the law; and (3) TCEQ improperly amended the ALJ's conclusions and proposal for decision.

### *Standard of review*

The parties agree that our review of TCEQ's order is governed by APA section 2001.174. This standard requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are

(A)     in violation of a constitutional or statutory provision;

(B)     in excess of the agency's statutory authority;

(C)     made through unlawful procedure;

(D)     affected by other error of law;

(E)     not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F)     arbitrary or capricious or characterized by abuse of discretion
        or clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174(2).  However, we may not substitute our judgment for that of the agency's on the weight of the evidence on matters committed to agency discretion. *Southwestern Pub. Serv. Co. v. Public Util. Comm'n of Tex*., 962 S.W.2d 207, 215 (Tex. App.—Austin 1998, pet. denied).  With respect to subparagraph (E), "substantial evidence" does not mean a large or considerable amount of evidence, but such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact.  *Pierce v. Underwood*, 487 U.S. 552, 564–65 (1988); *Lauderdale v. Texas Dep't of Agric*., 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ).  The test is not whether the agency made the correct conclusion in our view, but whether some reasonable basis exists in the record for the agency's action.  *Railroad Comm'n of Tex. v. Pend Oreille Oil & Gas Co., Inc.*, 817 S.W.2d 36, 41 (Tex. 1991).  We must uphold an agency's finding even if the evidence actually preponderates against it, so long as enough evidence suggests the agency's determination was within the bounds of reasonableness. *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215.

### *Waste*

Plaintiffs, referencing the penalties assessed against them for violations arising from unauthorized storage of solid and hazardous wastes, argue that there is no evidence in the record that TCEQ determined that the stored materials were, in fact, "solid waste" or "hazardous waste" as those term are defined by the relevant regulations.  *See* 30 Tex. Admin. Code 101.1(42) (defining "hazardous waste"), (93) (defining "solid waste") (West 2011) (Texas Comm'n on Envtl. Quality, Definitions).  We disagree.

28

TCEQ investigator Marlow testified that during his investigation of the Palmer Barge site in June and July of 1999, he saw "waste" in containers that smelled of hydrocarbons and, in his experience, materials with that odor had "hazardous characteristics." Based on his observations, he requested testing and analysis of the materials by an outside contractor for TCEQ. He further testified that those tests showed significant levels of benzene in the samples taken from the site and that benzene is a hazardous waste.

In addition to Marlow's testimony, the record contains other evidence supporting TCEQ's determination that there was waste at the site. Most significantly, Plaintiffs stipulated to the information contained in the inspection report Marlow referenced in his testimony. That report, which was included as an exhibit to the administrative hearing, includes the following relevant information:

> [T]en soil samples were taken during th[e screening site inspection] in question in this action . . . . [T]hose ten soil samples were analyzed and . . . the analyzing procedure was accurate and credible . . . . [T]hose ten soils samples showed detectable limits of either or both industrial and hazardous waste . . . . [T]hose ten soil samples were taken on the property known as Palmer Barge site . . . .

This report also includes a list of "hazardous substances," including benzene, found in detectable quantities at the Palmer Barge site. Finally, TCEQ introduced into evidence the agreed order between it and John Palmer from January 2000. In that order, TCEQ and Palmer agree that the Palmer Barge site contained waste materials, including waste oils, diesel fuel, and liquid waste.

Based on this evidence, there is a reasonable basis in the record for the agency's determination. *See Pend Oreille*, 817 S.W.2d at 41. As TCEQ's determination that the materials

29

were waste is within the bounds of reasonableness, we are required to uphold that decision. *See Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215.

### *Retroactive application of the law*

Plaintiffs argue that TCEQ's use of the 2002 Penalty Policy to assess fines for violations occurring in 1999 was an unlawful, retroactive application of the law. *See* Tex. Const. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."). This assertion, however, presumes that the Penalty Policy has a legal effect on the Plaintiffs. As we have previously explained, however, the Penalty Policy has no such effect because it does not control the TCEQ commissioners' ultimate exercise of their statutory discretion to impose penalties.

### *Amendment of ALJ's proposal for decision*

In their final challenge to TCEQ's order, Plaintiffs assert that TCEQ improperly overturned the ALJ's conclusions and proposal for decision by "arbitrarily alter[ing] one finding of fact and twelve conclusions of law." Specifically, Plaintiffs argue that TCEQ's modifications to one finding and twelve conclusions—all of which involve, in some aspect, TCEQ's calculations or the penalties assess against Plaintffs—were not "authoriz[ed] by law or policy" or supported by the evidence in the record. We disagree.

Section 2003.047(m) of the government code allows TCEQ to amend the ALJ's proposal for decision, including any findings of fact, as long as the amendment is "based solely on the record" and is "accompanied by an explanation of the basis of the amendment." *See* Tex. Gov't

Code Ann. § 2003.047(m) (West 2008). We have interpreted that section to require that any changes to the ALJ's proposed findings and conclusions be reviewed under APA section 2001.174—i.e., we review legal conclusions for error of law and factual findings for support by substantial evidence. *See CenterPoint Energy Entex v. Railroad Comm'n of Tex.*, 213 S.W.3d 364, 369 (Tex. App.—Austin 2006, no pet.); *Heat Energy Advanced Tech., Inc. v. West Dallas Coal. For Envtl. Justice*, 962 S.W.3d 288, 295-96 (Tex. App.—Austin 1998, pet. denied) (citing *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 214-16).

TCEQ modified the ALJ's finding of fact that "[a]ll of the penalty calculation worksheets (PCWs) prepared by [TCEQ] to support its proposed administrative penalties contain errors, unproven assumptions and unproven bases" to state instead that "[t]he penalty calculation worksheet (PCW) prepared by the Executive Director to support [its] propose[d] administrative penalties inaccurately reflects the number of violation events for continuing violations and programmatic violations." As the basis for its change, TCEQ explained that "although the [Executive Director] did have some inaccuracies in the penalty calculation worksheet, there were not unproven assumption and bases." Plaintiffs argue that this change was arbitrary, but the record contains both testimonial and documentary evidence reflecting the number of violation events that occurred on the site at issue here and their duration. Given this support in the evidence and TCEQ's inclusion of an explanation for the change, we cannot conclude that TCEQ's actions here were arbitrary and capricious. Further, we note that TCEQ is not required to make findings on matters that it did not rely on for support of its ultimate determinations. *See City of Dallas v. Railroad Comm'n of Tex.*, No. 03-06-00580-CV, 2008 WL 4823225, at * 8 (Tex. App.—Austin 2008, no pet.)

31

(citing *State Banking Bd. v. Valley Nat'l Bank*, 604 S.W.2d 415, 419 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.)).

Plaintiffs also complain of TCEQ's deletion of the ALJ's conclusion that "[e]ach violation is considered only on a Facility-wide basis." Specifically, Plaintiffs assert that TCEQ's omission and explanation for the omission—i.e., that the "Penalty Policy provides for each discrete area of violation, and there were separate and discrete areas at the cite"—is not supported by language of the Penalty Policy. We disagree. The Penalty Policy provides that "[t]he number of violation events that will be assessed a penalty depends on the number of times the violation is observed, the specific requirement violated, the duration of the violation, and *other case information*." (Emphasis added.) Further, the record contains evidence supporting TCEQ's conclusion that the Palmer Barge site should be treated as four separate areas, including Slay's testimony regarding the existence of four separate tracts owned by four separate entities. Regardless, given TCEQ's broad discretion in interpreting its own internal guidelines, the broad language of the Penalty Policy regarding determination of violations, and the evidentiary support for the omission, we cannot say that TCEQ's deletion here was arbitrary.

In a related argument, Plaintiffs complain of TCEQ's modifications to five of the ALJ's conclusions of law regarding the number and duration of violation events for which Plantiffs were cited. Four of these modifications involved changing conclusions from "[t]he collective violation by [Plaintiffs] constitutes one violation event" to "[t]he collective violation by [Plaintiffs] constitutes," depending on the alleged violation, either "5 monthly events" or "fifteen violation events." These changes were made, according to TCEQ, "to reflect monthly penalties for

32

violations during the five months from the site inspection to EPA's removal action, rather than a single violation." The remaining modification changed the ALJ's conclusion that "PCWs prepared by [TCEQ] do not support the administrative penalties proposed by [TCEQ]" to the "PCW prepared by [TCEQ] inaccurately reflect the number of violation events for continuing violations and programmatic violations." This conclusion was changed, TCEQ explained, "to reflect that [TCEQ] inaccurately calculated the number of months for which penalties should be assessed because the waste was removed by EPA five months after the inspection, and [TCEQ] had calculated ten months from the inspection to the screening."

Plaintiffs argue that neither the Penalty Policy nor the evidence supports these modifications. We note, however, that in addition to the evidence discussed above regarding treatment of the site as four separate areas, the record contains evidence that the violations occurred over a five-month period of time. Further, as discussed previously, the Penalty Policy's language regarding these calculations is quite broad. Given the supporting evidence, the inclusion of an explanation for each change, and the broad language of the Penalty Policy, we cannot say that TCEQ's amendments to the ALJ's conclusions were arbitrary.

We overrule Plaintiffs' third issue.

**CONCLUSION**

In light of the foregoing analysis, we reverse the portion of the district court's judgment denying the State Defendants' plea to the jurisdiction and holding that it has subject-matter jurisdiction over Plaintiffs' APA section 2001.038 claim. We render judgment dismissing Plaintiffs'

APA section 2001.038 claim for want of subject-matter jurisdiction. We otherwise affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Goodwin

Affirmed in part; Reversed and Dismissed in part

Filed: August 31, 2011