# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-12-00560-CV

The Texas State Board of Pharmacy, and in their official capacities only, Gay Dodson, Executive Director; and Jeanne D. Waggener, President of the Board, Appellants

v.

Tiana Jean Witcher, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-GN-12-000026, HONORABLE TIM SULAK, JUDGE PRESIDING

# O P I N I O N

After a contested-case hearing, the Texas State Board of Pharmacy ("the Board") indefinitely suspended Tiana Witcher's pharmacist license. Witcher filed a suit for judicial review of the Board's order. *See* Tex. Gov't Code Ann. § 2001.176 (West 2008). The trial court reversed the Board's order and remanded the cause to the Board, concluding that the indefinite suspension of Witcher's license was arbitrary and capricious and also was based on an invalid rule. *See id.* § 2001.174(2). We will affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are largely undisputed. Witcher received her Texas pharmacist license in 1987 and her North Carolina pharmacist license in 1992 via reciprocity. In November 2007, her husband died in a car accident two weeks after they were married. In

October 2008, near the anniversary of his death, Witcher became so intoxicated during her personal time that she had to be treated for alcohol poisoning. On the advice of a colleague, Witcher self-referred to the North Carolina Pharmacist Recovery Network (NCPRN), a program that aids impaired pharmacists, to address alcohol-abuse issues in her personal life. She voluntarily entered into a monitoring contract with NCPRN in January 2009.

Witcher subsequently came under scrutiny by the North Carolina licensing authority when she failed to comply with the terms of her monitoring agreement with the NCPRN. Due to the compliance issues, the North Carolina licensing authority suspended Witcher's pharmacist license in April 2010 based on concerns that she was unfit to practice pharmacy. In suspending Witcher's license, the North Carolina licensing authority found that she had "[i]ndulged in the use of drugs to an extent that renders the pharmacist unfit to practice pharmacy" and "[d]eveloped a physical or mental disability that render[ed her] unfit to practice pharmacy with reasonable skill, competence and safety to the public." *See* N.C. Gen. Stat. Ann. § 90-85.38(a)(3), (5). Under the North Carolina suspension order, Witcher is ineligible to petition for reinstatement of her license until the NCPRN advocates for its reinstatement, a condition presumably directed to ensuring her fitness to practice pharmacy.[1] The North Carolina order further specifies that only the NCPRN may monitor Witcher's recovery.

---

[1] The North Carolina suspension order notes that becoming eligible to petition for reinstatement does not guarantee that such petition will be granted. Thus, even if Witcher satisfies the precondition to applying for reinstatement, her license would remain suspended indefinitely under the North Carolina suspension order.

2

After Witcher's North Carolina license was suspended, she returned to Texas to live with her father because she lacked means to earn a living in North Carolina, had lost her house in foreclosure, and had no family or support system in North Carolina. Upon returning to Texas, she voluntarily enrolled in Texas Pharmacist Recovery Network (TxPRN), became successfully employed as a pharmacist, and participated in therapy. Witcher averred that she did not abuse alcohol after her October 2008 hospitalization, did not abuse alcohol on the job, and sought assistance from NCPRN and TxPRN on her own initiative. While in Texas, Witcher has exhibited no signs of alcohol impairment in the workplace or elsewhere.

Based on the active suspension of Witcher's license in North Carolina, however, the Board instituted disciplinary proceedings to suspend Witcher's Texas license until the suspension of her North Carolina license is lifted. *See* Tex. Occ. Code Ann. §§ 565.001(a)(16) (West 2012) (authorizing disciplinary action against licensed pharmacist disciplined by another state). Along with the disciplinary complaint, the Board's staff filed a motion for summary disposition, asserting that, as a matter of law, (1) Witcher was subject to discipline under section 565.001(a)(16) of the Texas Pharmacy Act (TPA), which authorizes the Board to discipline a license holder who has "been disciplined by the regulatory board of another state for conduct substantially equivalent to conduct described under this subsection"; (2) the violations found by the North Carolina licensing authority were, as a matter of law, substantially equivalent to conduct prohibited in TPA sections 565.001(a)(4) and (a)(7); and (3) the appropriate disciplinary sanction was "a period of suspension in Texas to run concurrently with the North Carolina suspension." *See id*. §§ 565.001(a)(4) (pharmacist may be disciplined upon "developing an incapacity that prevents the applicant or license

3

holder from practicing pharmacy with reasonable skill, competence, and safety to the public"), (a)(7) (pharmacist may be disciplined for "us[ing] drugs in an intemperate manner that, in the board's opinion, could endanger a patient's life"), (a)(16) (pharmacist may be disciplined based on disciplinary action in another state for conduct that would violate the TPA); 565.051 (discipline for violation of TPA includes revocation, suspension, probated suspension, and licensing restrictions).

Witcher admitted that she was subject to being disciplined by the Board based on the North Carolina disciplinary action. However, because she had not abused alcohol since October 2008 and it was undisputed that she was presently fit to practice pharmacy, she advocated for a five-year probated suspension in keeping with Board precedent in disciplinary proceedings involving impaired pharmacists who had engaged in significantly more egregious conduct but who had demonstrated current fitness to practice to the Board's satisfaction.

The administrative law judge (ALJ) who presided over the disciplinary proceedings granted partial summary disposition as to Witcher's violation of the TPA but denied summary disposition regarding the appropriate sanction to be imposed.[2] *See* 1 Tex. Admin. Code § 155.505

---

[2] In granting partial summary disposition, the ALJ concluded from the following undisputed facts that Witcher was subject to disciplinary action by the Board in accordance with section 565.001(a)(16) of the TPA:

1. Tiana J. Witcher (Respondent) holds pharmacist license No. 30135 issued by the Texas State Board of Pharmacy (Board) on October 21, 1987.

2. On or about April 20, 2010, the North Carolina Board of Pharmacy (NCBP) entered a Final Order against the North Carolina license No. 11664 held by [Witcher]. That order made the following Findings of Fact:

(State Office of Admin. Hearings, Summary Disposition) (West 2012) (authorizing ALJ to issue

decision without evidentiary hearing if no genuine issue of material fact and party is entitled to

<div style="padding-left: 4em;">

a)      On or about January 29, 2009, [Witcher] voluntarily entered a substance abuse program administered by North Carolina Pharmacist Recovery Network (NCPRN). At that time Respondent entered into a contract governing the terms of her participation in the program (Contract).

b)      Between approximately March 2009 and November 2009, Respondent violated the terms of the Contract in various ways, including but not limited to:

         i.      By failing to call in to determine if she should be drug tested on or about March 14, 2009, April 15, 2009, and April 17, 2009;

         ii.      By submitting dilute urine samples on or about June 9, 2009, July 27, 2009, September 8, 2009, October 21, 2009, and November 24, 2009;

         iii.      By violating the Contract's limitations on her employment, specifically by working the third shift at the North Carolina Baptist Hospital Pharmacy in or about April 2009, without approval from NCPRN, and after NCPRN had denied her request for such approval; and

         iv.      By failing to participate in the required sessions of continuing care in July 2009.

</div>

3.      The April 10, 2010, Order placed [Witcher's] license on an indefinite suspension with the requirement that she may not petition for reinstatement unless she provides the NCBP with written notice from NCPRN that NCPRN will advocate for [her] reinstatement.

4.      [Witcher] had been disciplined by a regulatory board of another state for conduct substantially equivalent for which the Board may discipline a licensee.

decision as matter of law). After an evidentiary hearing directed solely to the appropriate sanction, the ALJ recommended a five-year probated suspension, finding among other things that (1) Witcher voluntarily entered into a participation agreement with TxPRN, (2) she had complied with all terms and conditions of her TxPRN participation agreement, (3) she had been sober since October 22, 2008, which was prior to her self-referral to NCPRN, and was not working when she was impaired due to alcohol use, (4) she "can safely practice pharmacy in Texas," (5) the mitigating factors in her case outweighed the aggravating factors, (6) it was "not feasible for [Witcher] to participate in the NCPRN program as a precondition to having the suspension of her North Carolina license lifted, and it is not financially viable for her to return to North Carolina," and (7) the North Carolina licensing authority would not accept Witcher's participation in the TxPRN program as a substitute for the requirement that she participate in the NCPRN program. The ALJ further found that, in relocating to Texas, Witcher was "not seeking to evade compliance with the reinstatement provisions of the North Carolina order, but only to avoid the considerable financial hurdles she would face to achieve that compliance."

The Board adopted all of the ALJ's recommended findings of fact and conclusions of law without modification. However, in keeping with the Board's previously articulated policy that a pharmacist with an active suspension in another state cannot practice pharmacy in Texas, the Board rejected the ALJ's recommended sanction and instead suspended Witcher's Texas license until her North Carolina license has been reinstated. The Board also required Witcher to submit to simultaneous monitoring by the TxPRN, even though the terms of both the NCPRN and TxPRN

6

agreements require Witcher to be physically present to participate in or complete several of the tasks, including meeting attendance and drug and alcohol screenings.

After exhausting her administrative remedies, Witcher filed a suit for judicial review in the trial court. *See* Gov't Code § 2001.176. Witcher alleged, and the trial court ultimately found, that (1) an enforced suspension of Witcher's license is arbitrary and capricious in light of the facts found by the Board and its conclusions of law, (2) the Board used an unwritten policy ("reciprocal-sanctions policy") to impose an enforced suspension on Witcher's license, and (3) the use of the reciprocal-sanctions policy was arbitrary and capricious, resulted from improper ad-hoc rulemaking, and violated the formal rulemaking requirements in the Administrative Procedure Act (APA) and the TPA. *See id.* § 2001.174(2) (specifying when trial court must reverse and remand in suit for judicial review); *see also id.* §§ 2001.021-.041 (West 2008 & Supp. 2012) (governing agency rulemaking); Tex. Occ. Code Ann. §§ 554.051-.057 (West 2012) (prescribing Board's rulemaking authority). The trial court did not disturb any of the Board's findings of fact and conclusions of law (which were unchallenged), but the court reversed the portion of the final order imposing an indefinite enforced suspension of Witcher's license. The court ordered the cause remanded to the Board to determine an appropriate sanction consistent with the court's findings but limited the proceedings on remand to the established record and the Board's affirmed fact findings and conclusions of law. *See* Gov't Code § 2001.174(2) (governing judicial review of agency decisions).

On appeal, the Board contends that the reciprocal sanction imposed in Witcher's case was not arbitrary and capricious because the Board has the exclusive authority to impose penalties and the sanction imposed was (1) within the range of sanctions authorized in the TPA, (2) consistent

7

with statutory provisions that automatically deny licensing to new applicants who are subject to an active suspension in another state, and (3) consistent with the Board's policy, practice, and precedent of imposing reciprocal sanctions on Texas licensees who have been disciplined by other states.

**DISCUSSION**

In addition to having the authority to discipline a pharmacist for acts violating Texas laws and federal law applicable in Texas, the Board may also discipline pharmacists who have been disciplined by pharmacy regulatory boards in other states if the pharmacist was disciplined for conduct that would violate the TPA. Occ. Code § 565.001(a)(16). If a pharmacist is found to have committed violations in another state that are substantially equivalent to Texas violations, the Board has available to it the same disciplinary options in regard to limiting a pharmacist's practice as it would have for a violation committed in Texas. *See id.* § 565.051. Those options include revocation, enforced suspension, probated suspension, and license restrictions. *See id.* Although the Board may consider an ALJ's recommendation regarding the sanction to be imposed, the Board retains discretion to determine the appropriate sanction. 22 Tex. Admin. Code § 281.60(b) (Tex. State Bd. of Pharmacy, General Guidance); *cf. Sears v. Texas State Bd. of Dental Exam'r*s, 759 S.W.2d 748, 751 (Tex. App.—Austin 1988, no writ) ("The agency is charged by law with discretion to fix the penalty when it determines that the statute has been violated.").

In selecting the appropriate sanction, the Board has formally promulgated rules setting forth guidelines to be considered in assessing sanctions for violations of the Act. Those guidelines specify that "[t]he ultimate purpose of disciplinary sanctions is to protect and inform the public, deter future violations, offer opportunities for rehabilitation, if appropriate, punish violators, and deter

8

others from violations." 22 Tex. Admin. Code § 281.60(c) (Tex. State Bd. of Pharmacy, General Guidance). The guidelines are further "intended to promote consistent sanctions for similar violations." *Id.* Included in the analytical framework guiding disciplinary matters is section 281.62, a rule that prescribes several aggravating and mitigating factors that the Board may consider in assessing the appropriate disciplinary penalty.[3] Although the Board adopted the ALJ's finding that

---

[3] Rule 281.62 provides:

The following factors may be considered in determining the disciplinary sanctions imposed by the board if the factors are applicable to the factual situation alleged. . . .

(1) Aggravation. The following may be considered as aggravating factors so as to merit more severe or more restrictive action by the board:
    (A) patient harm and the severity of patient harm;
    (B) economic harm to any individual, entity, or the environment, and the severity of such harm;
    (C) increased potential for harm to the public;
    (D) attempted concealment of the conduct which serves as a basis for disciplinary action under the Act;
    (E) premeditated conduct which serves as a basis for disciplinary action under the Act;
    (F) intentional conduct which serves as a basis for disciplinary action under the Act;
    (G) motive for conduct which serves as a basis for disciplinary action under the Act;
    (H) prior conduct of a similar or related nature;
    (I) disciplinary actions taken by any regulatory agency of the federal government or any state;
    (J) prior written warnings or written admonishments from any government agency or official regarding statutes or regulations pertaining to the conduct which serves as a basis for disciplinary action under the Act;
    (K) violation of a board order;
    (L) failure to implement remedial measures to correct or mitigate harm from the conduct which serves as a basis for disciplinary action under the Act;
    (M) lack of rehabilitative potential or likelihood for future conduct of a similar nature;
    (N) relevant circumstances increasing the seriousness of the conduct which

9

the mitigating factors in Witcher's case outweighed the aggravating factors, it nonetheless imposed an enforced suspension of Witcher's license coterminous with the suspension of her North Carolina indefinite suspension.

It is undisputed that, under the TPA, the Board had the authority to discipline Witcher and to impose an enforced suspension of her license. The overarching issue in this appeal, however, is whether the particular sanction imposed—enforced suspension of Witcher's license concurrently with the suspension of her North Carolina license—resulted from the improper application of a

---

serves as a basis for disciplinary action under the Act; and
(O) circumstances indicating intoxication due to ingestion of alcohol and/or drugs.
(2) Extenuation and Mitigation. The following may be considered as extenuating and mitigating factors so as to merit less severe or less restrictive action by the board:
(A) absence of potential harm to the public;
(B) self-reported and voluntary admissions of the conduct which serves as a basis for disciplinary action under the Act;
(C) absence of premeditation to commit the conduct which serves as a basis for disciplinary action under the Act;
(D) absence of intent to commit the conduct which serves as a basis for disciplinary action under the Act;
(E) absence of prior conduct of a similar or related nature;
(F) absence of disciplinary actions taken by any regulatory agency of the federal government or any state;
(G) implementation of remedial measures to correct or mitigate harm from the conduct which serves as a basis for disciplinary action under the Act;
(H) rehabilitative potential;
(I) prior community service and present value to the community;
(J) relevant circumstances reducing the seriousness of the conduct which serves as a basis for disciplinary action under the Act;
(K) relevant circumstances lessening responsibility for the conduct which serves as a basis for disciplinary action under the Act; and
(L) treatment and/or monitoring of an impairment.

22 Tex. Admin. Code § 281.62 (Tex. State Bd. of Pharmacy, Aggravating and Mitigating Factors).

"rule" as that term is defined in the APA. *See* Tex. Gov't Code Ann. § 2001.003(6) (West 2008) (defining "rule" for purposes of APA). A rule that is not properly promulgated under mandatory APA procedures is invalid, *see El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 714 (Tex. 2008), and an agency decision based on an invalid rule must be reversed and remanded to the agency if substantial rights of the appellant have been prejudiced thereby, *see* Gov't Code § 2001.174(2) (specifying when trial court must reverse and remand agency decision). Because the Board's action in this case undeniably affected Witcher's substantial rights, we focus our analysis on whether the Board applied an improperly promulgated "rule" within the meaning of the APA.

The Board does not dispute that, in the present case, it employed what is characterized as a "non-binding" policy, practice, or precedent of imposing reciprocal sanctions on Texas licensees who have been disciplined by licensing authorities of other states if the conduct would have been sanctionable if committed in Texas. It is further undisputed that the Board did not adopt this policy, practice, or precedent in accordance with the APA's formal rulemaking procedures. The Board contends, however, that no matter how the reciprocal-sanctions policy is characterized, it was not required to comply with the APA's rulemaking procedures because the policy is not a "rule" within the meaning of the APA but rather is a "statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *See* Gov't Code § 2001.003(6)(c) (excluding such statement from APA's definition of "rule"). The Board asserts that it has the authority to develop internal practices intended to promote consistency in the assessment of administrative penalties and that the reciprocal-sanctions policy furthers that goal. Alternatively,

11

the Board asserts that it was entitled to adopt the policy as an ad-hoc rule because the Board did not have sufficient experience with the issue of suspended pharmacists to develop a "hard and fast rule." *See City of El Paso v. Public Util. Comm'n of Tex.*, 883 S.W.2d 179, 188-89 (Tex. 1994) (observing that agency rule may be adopted outside formal rulemaking procedures in limited circumstances including novel situations in which agency is inexperienced).

Witcher contends, however, that the policy falls squarely within the APA's definition of a rule, was not properly promulgated under the APA, and does not qualify for any of the exceptions to the requirement of formal rulemaking. *See, e.g.*, *id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947), as recognizing that agency has discretion to proceed on ad hoc or "case-by-case" basis when issue is novel to agency or so specialized and varying as to be impossible of capture within any general rule); *see also Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.*, 745 S.W.2d 918, 926 (Tex. App.—Austin 1988, writ denied) (also recognizing ad hoc rulemaking can be appropriate to flesh out new statute or rule). Witcher also asserts that, absent the application of a rule, the Board's chosen sanction is arbitrary and capricious because, among other things, there is no rational relationship between the facts found by the Board and the sanction imposed. *See City of El Paso*, 883 S.W.2d at 184 (agency decision is arbitrary if agency fails to consider statutorily required factor, considers irrelevant factor, or weighs only relevant factors but reaches unreasonable result). Stated another way, Witcher contends that absent the application of a valid rule mandating a reciprocal sanction, such a sanction is unreasonable considering both her individual circumstances and prior Board precedent involving pharmacists who engaged in significantly more egregious substance-abuse conduct but who received probated five-year sentences

12

upon establishing fitness to practice, as she has in this case. *See* Agreed Board Order #G-09-025 (May 5, 2010) (pharmacist who stole drugs from pharmacy, abused legal and illegal drugs, and violated terms of monitoring agreement with TXPRN given one-year active suspension followed by five-year probated suspension if fitness to practice established by end of active suspension); Agreed Board Order #G-10-020 (June 7, 2011) (involving similar facts and sanctions); Agreed Board Order #B-08-038-A (Aug. 11, 2010) (pharmacist who stole controlled substances given limited active suspension followed by five-year probated suspension if fitness to practice established by end of active suspension).

The APA defines a "rule" as follows:

"Rule":

(A) means a state agency statement of general applicability that:
  i. implements, interprets, or prescribes law or policy; or
  ii. describes the procedure or practice requirements of a state agency;

(B) includes the amendment or repeal of a prior rule; and

(C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

Gov't Code § 2001.003(6). This Court has held that, to constitute a "rule" under this definition, "an agency statement interpreting law must bind the agency *or otherwise represent its authoritative position in matters that impact personal rights*." *Texas Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 703 (Tex. App.—Austin 2011, no pet.) (emphasis added); *see Texas Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 905 (Tex. App.—Austin 2009, no pet.) ("Agency statements that

'have no effect on private persons' are not considered rules.") (quoting *Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 764, 770 (Tex. App.—Austin 1999, no pet.)); *Combs v. Entertainment Publ'n*s, 292 S.W.3d 712, 722 (Tex. App.—Austin 2009, no pet.) (emphasizing that legal interpretation in Comptroller's letters would bind agency employees and "unambiguously express[ed] an intent to apply this interpretation . . . in all future cases" involving private parties in similar circumstances); *Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex.*, 997 S.W.2d 651, 658 (Tex. App.—Austin 1999, pet. dism'd w.o.j.) (agency memoranda to its law-enforcement agents held to constitute "rules" on that record where there was evidence that agents "*not only intend to enforce, but have enforced administrative sanctions*" in accordance with memoranda (emphasis added)); *see also Brinkley*, 986 S.W.2d at 770 (observing that agency advisory opinion regarding applicable law would have no legal effect "absent a statute that so provides *or some attempt by the agency to enforce its statement against a private person*" (emphasis added)). "Although the distinction between a 'rule' and an agency statement that concerns only 'internal management or organization . . . and not affecting private rights may sometimes be elusive, the core concept is that the agency statement must in itself have a binding effect on private parties." *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 546 (Tex. App.—Austin 2011, pet. denied) (emphasis added). In that regard, a distinction exists between nonbinding evaluative guidelines that take into consideration case-specific circumstances—which have been held not to be a rule—and policies that dictate specified results without regard to individual circumstances, which have been held to be a rule. *Compare id.* at 538-39, 548 (agency's guidelines used to evaluate environmental violations for purposes of recommending penalty based on individual circumstances

14

was not "rule" under APA), *with El Paso Hosp. Dist.*, 247 S.W.3d at 714 (by establishing cut-off date for accepting data to determine hospitals' Medicaid reimbursement rate, agency established "rule" within meaning of APA) *and Entertainment Publ'ns*, 292 S.W.3d at 721 ("[T]he Comptroller's statements in the March and April 2008 letters that the Comptroller will uniformly regard brochure-fundraising firms as the sellers and nonprofit entities as the sellers' agents, without regard to the individual factors considered under the Comptroller's previous guidelines, are 'generally applicable' statements for purposes of the APA.").

The Board's disciplinary order in this case, coupled with the evidence developed in the administrative proceeding, leave little doubt that the Board's reciprocal-sanctions policy is a statement implementing, interpreting, or prescribing the agency's policy that affects private rights, has implications beyond the parties to the underlying proceeding, and is, therefore, a rule within the meaning of the APA. *See El Paso Hosp. Dist.*, 247 S.W.3d at 714 (stating that "general applicability" under APA references agency statements that affect interests of public at large such that they cannot be given effect of law without public input); *see also CenterPoint Energy Entex v. Railroad Comm'n of Tex.*, 213 S.W.3d 364, 369 (Tex. App.—Austin 2006, no pet.) ("Ad hoc rulemaking occurs when the agency makes a determination that has implications beyond the instant parties . . . .").

In the final agency order in Witcher's disciplinary proceeding, the Board explained its reciprocal-sanctions policy in the following terms of general applicability:

> A concurrent suspension is the appropriate disciplinary sanction because the Board can not [sic] allow pharmacists to work in Texas who have had their practice ability taken away in another state. The integrity of all states' licensing systems is

15

compromised if pharmacists are allowed to jump from state to state in order to avoid disciplinary action. The Board has a duty to respect the public acts of another state board. This promotes uniformity and consistency in regulation among the states.

As articulated, the Board's reciprocal-sanctions policy applies not just to Witcher but to all pharmacists licensed in more than one state. The order essentially states that the Board is *duty-bound* to impose reciprocal disciplinary action without regard to any other factor that might be considered in individual circumstances.

The general applicability of the Board's policy is underscored by the passage that followed its articulation, which further demonstrates that the reciprocal-sanctions policy was applied without regard to the specific circumstances in Witcher's case:

Although the ALJ's recommendation [of a five-year probated sentence with monitoring] may satisfy concerns the Board would have regarding [Witcher's] impairment, it would not address the fact that [Witcher] is barred from practicing pharmacy by a regulatory board of another state for conduct substantially equivalent to conduct described under the Texas Pharmacy Act.

Moreover, contrary to the stated rationale for the reciprocal-sanctions policy, the Board adopted the ALJ's finding that Witcher was "not seeking to evade compliance with the reinstatement provisions of the North Carolina order, but only to avoid the considerable financial hurdles she would face to achieve that compliance." Significantly, although the Board found that requiring Witcher to participate in the NCPRN program as a precondition to having the suspension of her North Carolina license lifted is not reasonably possible given her current circumstances, it nonetheless ordered her

16

to do just that.[4]  These findings and conclusions support the construction of the Board's policy as a rule that applies irrespective of the circumstances in an individual case.

The general applicability of the reciprocal-sanctions policy and its impact on the interests of the public at large is further evident from the evidence and testimony admitted at the hearing before the ALJ.  At the evidentiary hearing, Carol Fisher, the Board's Director of Enforcement, testified that reciprocal discipline is the "Board's policy" and the "standard sanction." As the source of the policy, Fisher cited the case of *In re Nealy*, in which the Board had previously articulated its reciprocal-sanctions policy in the same terms of general applicability in a particularly egregious case in which a pharmacist who received his Texas license via reciprocity with Louisiana had a long history of violating the pharmacy laws of both states.  *See Texas State Bd. of Pharmacy v. Nealy*, Board Order #N-03-005, SOAH Docket No. 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 (2005).  After nearly 15 years of suspensions, revocations, reinstatements, and continuing violations, the Board suspended Nealy's license concurrently with an active suspension of his Louisiana license, and stated:

---

[4] The Board adopted the ALJ's finding that it would not be "feasible" for Witcher to comply with the NCPRN precondition to reinstatement.  "Feasible" is defined to mean "capable of being done . . . possible of realization," "capable of being managed, utilized or dealt with successfully," and "reasonable, likely."  *Webster's Third New Int'l Dictionary:  Unabridged* 831 (2002).  "An agency's decision is arbitrary or results from an abuse of discretion if the agency . . . weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result."  *City of El Paso v. Public Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994) .  Thus, even if we were to agree with the Board that its policy is not a rule under the APA, the imposition of a requirement that the Board itself found to be virtually impossible would suggest that the Board's decision is arbitrary and capricious.  If the Board applied a properly promulgated rule dictating such a consequence, however, it would be more difficult to conclude that the sanction lacked a rational basis.  *Cf. Pierce v. Texas Racing Comm'n*, 212 S.W.3d 745, 753-54 (Tex. App.—Austin 2006, pet. denied) (agency did not abuse its discretion in applying zero-tolerance policy when racehorse tested positive for banned substance and unchallenged "guidelines" mandated loss of purse for type of violation involved).

17

In previous cases with similar facts, the Board has typically imposed disciplinary action mirroring the action by another state board of pharmacy. The policy the Board considers in taking such action is to prevent licensees from escaping disciplinary action in one state by coming to Texas. If another state board of pharmacy has prohibited a pharmacist from practicing, so long as there is no evidence that a pharmacist has not been afforded due process in the other state, *the Board believes it is sound policy for the pharmacist to be prevented from practicing in Texas until the pharmacist resolves the restrictions on his license in the other state.* Otherwise a pharmacist would suffer no negative consequences from violations of the law in another state. Other pharmacists with licenses in Texas and in another state might assume that similar violations would not merit serious consideration by the Board.

*Id.* (emphasis added). Although the factual circumstances and extensive disciplinary history in *Nealy* would have justified the imposition of a reciprocal sanction without regard to the enunciated policy, the Board made a point of articulating the policy itself as the basis for imposing a reciprocal sanction. As the Board's staff noted in its written closing argument in Witcher's case: "It is clear from the order [in *Nealy*] that [the Board] based the selection of the sanction on the licensee's disciplinary status in the other state and not upon his prior disciplinary history with [the Board]."

Despite the stark disparity in individual circumstances between Witcher's case and the facts in *Nealy*, Fisher testified that she did not expect that the Board would do anything differently from what it had done in *Nealy* because the fact of an active suspension of Witcher's North Carolina license was dispositive of the appropriate sanction. Fisher repeatedly testified to the effect that individual circumstances do not matter. In this regard, the reciprocal-sanctions policy is analogous to agency policies that this Court in *Combs v. Entertainment Publications, Inc.*, 292 S.W.3d 712 (Tex. App.—Austin 2009, no pet.), and the supreme court in *El Paso Hospital*

18

*District v. Texas Health & Human Services Commission*, 247 S.W.3d 709 (Tex. 2008), found to be

rules under the APA.

In *Entertainment Publications*, a brochure-fundraising firm that contracted with

tax-exempt schools to sell merchandise and food products to raise money for student groups

challenged an agency policy that would require it to collect and remit tax on its sale of those goods

to the schools. *Entertainment Publ'ns*, 292 S.W.3d at 715. Historically, the brochure-fundraising

firm had structured its transactions with its customers to take advantage of the exemption to avoid

collecting sales taxes on its initial sale of goods to those customers. *Id.* at 716. The tax-exempt

customers, in turn, could use a different provision of the tax code to avoid collecting sales tax on the

items when sold to the ultimate consumer, but only if the tax-exempt customer was considered to

be the "seller" of the merchandise. *Id.* To determine who was the seller in such transactions, the

Comptroller had historically applied several criteria to analyze the actual substance of the

transaction. That policy had been reflected in an earlier letter ruling, which a representative of the

Comptroller's office testified accurately stated the Comptroller's policy as to brochure fundraising

at the time it was issued. However, the Comptroller subsequently issued two letters in which the

policy was changed from the factor-based approach to a bright-line rule that the fundraising firm

would always be considered the "seller."

Like the Board in the present case, the Comptroller in *Entertainment Publications*

argued that the letters were merely advisory opinions, not binding instructions, concerning her future

enforcement of the sales tax. This Court disagreed, holding:

19

There is no question in this case that the [Comptroller's] March and April 2008 letters are statements implementing, interpreting, or prescribing law or policy. As the Comptroller's witness testified, these letters communicated the Comptroller's intention to apply section 151.024 in all cases involving brochure fundraising firms, thereby interpreting that tax code to mean that such firms are, for purposes of collecting and remitting sales tax, always the "sellers" of the taxable items.

*Id.* at 720-21. The Court further concluded that the policy was "generally applicable" within the meaning of the APA because

the Comptroller's statements in the March and April 2008 letters that the Comptroller will uniformly regard brochure-fundraising firms as the sellers and nonprofit entities as the sellers' agents, without regard to the individual factors considered under the Comptroller's previous guidelines, are "generally applicable" statements for the purposes of the APA. These interpretations apply not only to [the appellant] and the tax-exempt groups with which it conducts business, but to all brochure-fundraising firms engaging in business across the state.

*Id.* at 721.

As in *Entertainment Publications*, the present case involves a policy that establishes a bright-line rule that is applicable without regard to individual circumstances that could be considered under section 281.62 of the Board's rules. In addition, both the terms of the final order and the testimony by the Board's Enforcement Director during the disciplinary proceeding reveal the Board's intent to apply the policy not just to Witcher but also prescriptively to others.

In *El Paso Hospital District*, the Texas Supreme Court considered whether the Health & Human Services Commission's ("HHSC") data-collection method for calculating prospective Medicaid inpatient service rates was an agency rule as defined by the APA. 247 S.W.3d at 711. In determining the reimbursement rate, HHSC employed a policy of accepting data from claims paid

only through a specified date in the year following the base year. *Id.* at 713. Claims for all patients admitted during the base year, but not paid by the cut-off date, were not included in determining the prospective reimbursement rates. *Id.* This policy resulted in the exclusion of data for services actually performed in the base year if the claims were not paid before the cut-off date. *Id.* The supreme court rejected HHSC's argument that the cut-off date was not a rule itself but rather an interpretation of its own base-year rule. *Id.* at 714. The court concluded that the cut-off rule fell squarely within the APA's definition of a rule because (1) it implemented HHSC's policy and described its data-collection procedure and (2) it applied to all hospitals receiving reimbursement for inpatient Medicaid services. *Id.*

The court observed that HHSC's rules provided that it would use a base year, defined as "[a] 12-consecutive-month period of claims data," to calculate the Hospitals' rates and that the effect of the cut-off date was to modify the base-year rule by controlling the data HHSC would use from that base year. *Id.* at 714 (quoting 1 Tex. Admin. Code § 355.8063(b)(5)). The court also determined that the cut-off date did not concern the agency's internal management or organization but rather affected the Hospitals' private rights. *Id.* at 714-15. Consequently, the court said, the Hospitals were "entitled to have their prospective reimbursement rates determined according to the formula set out in HHSC's rules." *Id.* Because the cut-off date was a rule that had not been properly promulgated, it was found to be invalid. *Id.*

In the present case, the reciprocal-sanctions policy the Board cited in its final order is analogous to the cut-off date in *El Paso Hospital District* in that it establishes one of the aggravating factors in section 281.62 of the Board's rules—specifically, subsection (1)(I) pertaining

21

to disciplinary actions taken by any state—as an outcome-determinative factor. Although the use of the factors in section 281.62 is discretionary, the elevation of one of those factors to case-dispositive status either constitutes a modification of that rule or the establishment of a new rule.

The Board argues that the reciprocal-sanctions policy is like the evaluative penalty guidelines this Court concluded did not constitute a rule in *Slay v. Texas Commission on Environmental Quality*, 351 S.W.3d 532, 548 (Tex. App.—Austin 2011, pet. denied). That case—unlike the present case, *Entertainment Publ'ns*, and *El Paso Hospital District*—involved guidelines that required evaluation of case-specific factors in formulating a recommendation for an appropriate sanction. *See id.* at 537-42. Although the guidelines considered in *Slay* were intended to achieve a level of consistency when similar circumstances were present, they did not require a specific result in all cases. There was no per se penalty dictated by the guidelines; rather, the agency's staff was required to use a formalized analytical structure to evaluate the case, but the structure did not direct a particular outcome. *Id.* at 546-48. That is the opposite of the circumstances in the present case.

Considering the foregoing, we conclude that construing the Board's policy as a "rule" is consistent with the supreme court's instruction that we consider the intent of the agency, the prescriptive nature of the policy, and the context in which the agency statement was made. *Cf. Entertainment Publ'ns*, 292 S.W.3d at 722 (citing *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994)). The Board has unambiguously expressed its intent to apply the reciprocal-sanctions policy to all Texas pharmacists licensed to practice in other states, regardless

of whether the particular circumstances of each case might result in a different sanction if the aggravating and mitigating factors in agency rule 281.62 were considered. *Cf.* 22 Tex. Admin. Code § 281.62 (Tex. State Bd. of Pharmacy, Aggravating and Mitigating Factors) (listing factors that "may be considered in determining the disciplinary sanctions imposed by the board if the factors are applicable to the factual situation alleged"); *cf. also Entertainment Publ'ns*, 292 S.W.3d at 722 (construing Comptroller's letters that changed policy from "seller versus agent-for-seller" analysis to bright-line standard). Without doubt, the Board's policy "represent[s] its authoritative position in matters that impact personal rights."[5] *See Sunset Transp., Inc.*, 357 S.W.3d at 703.

---

[5] After issuing its final order in Witcher's case, the Board, using notice-and-comment rulemaking procedures, formally promulgated a rule requiring the imposition of reciprocal sanctions when a Texas licensee has been disciplined by the regulatory board of another state:

§ 281.67. Sanctions for Out-of-State Disciplinary Actions

(a)     When determining the appropriate sanction for a disciplinary action taken by a regulatory board of another state under § 565.001(a)(16), § 565.002(a)(13), or § 568.003(a)(13), the board has determined that the following shall be applicable for all types of licensees and registrants for such licenses and registrations issued by the board.

(1)     If the other state's disciplinary action resulted in the license or registration being restricted, suspended, revoked, or surrendered, the appropriate sanction shall be the same as the sanction imposed by the other state, such that the licensee or registrant has the same restriction against practice in Texas.

(2)     If the license or registration is subject to any other type of disciplinary sanctions, the appropriate sanction shall be equivalent to or less than that imposed by the other state unless contrary to board policy.

(b)     The sanctions imposed by this section can be used in conjunction with other types of disciplinary actions, including administrative penalties, as outlined in this section.

(c)     When a licensee or registrant has additional violations of the Texas Pharmacy Act, the board shall consider imposing additional more severe types of disciplinary sanctions, as deemed necessary.

23

Furthermore, having previously articulated the reciprocal-sanctions policy in *Nealy* and as it is rearticulated in Witcher's case, the Board is not entirely free to disregard it in future cases. Although an "'agency is not bound to follow its decisions in contested cases in the same way that a court is bound by precedent' . . . [,] an agency is required by courts to 'explain its reasoning when it "appears to the reviewing court that an agency has departed from its earlier administrative policy or there exists an apparent inconsistency in agency determinations."'" *Austin Chevrolet, Inc. v. Motor Vehicle Bd.*, 212 S.W.3d 425, 438 (Tex. App.—Austin 2006, pet. denied) (quoting *Flores v. Employees Retirement Sys. of Tex.*, 74 S.W.3d 532, 533-34 (Tex. App.—Austin 2003, pet. denied)).[6]

---

22 Tex. Admin. Code § 281.67 (Texas State Bd. of Pharmacy, Sanctions for Out-of-State Disciplinary Actions). In adopting that rule, the Board stated that the addition of section 281.67 "*clarifies* the sanctions for disciplinary actions taken by a regulatory board of another state." 37 Tex. Reg. 4046 (June 1, 2012) (emphasis added) (adopting new section 281.67 of Board's rules); 37 Tex. Reg. 2145 (Mar. 30, 2012) (emphasis added) (proposing new section 281.67). This statement of the formal rule as a "clarification" might be construed to further support the prescriptive nature and general applicability of the reciprocal-sanctions policy prior to its formal adoption as a rule. But even if it is not, it at least demonstrates that the policy was capable of being captured in a rule, thus rendering one of the recognized exceptions to the APA's formal rulemaking procedures inapplicable. *See City of El Paso*, 883 S.W.2d at 188-89 (observing that agency rule may be adopted outside formal rulemaking procedures in limited circumstances including when issue is so specialized and varying as to be impossible of capture within general rule).

[6] In light of the facts the Board adopted in Witcher's case and the Board's acknowledgment that the underlying rationale of the policy is not strictly applicable to Witcher's individual circumstances, it is difficult to conceive of a scenario in which the Board would not apply the policy. At oral argument, the only scenario the Board's counsel could hypothesize was one for which no discipline would be authorized under the Texas Pharmacy Act in the first instance—that is, counsel suggested that the Board would not impose reciprocal discipline if a pharmacist's license was suspended in another state for something absurd, like wearing a red t-shirt. However, such conduct would not be sanctionable under the Texas Pharmacy Act, and accordingly the reciprocal-sanctions policy would not be implicated. Occ. Code § 565.001 (providing grounds for disciplining Texas licensee).

The foregoing analysis leads us to conclude that the Board's informally announced reciprocal-sanctions policy constitutes an agency "rule" as that term is defined in the APA. It is well established that a rule that is not adopted in accordance with the APA's rulemaking procedures is typically invalid. *El Paso Hosp. Dist.*, 47 S.W.3d at 715 (citing Gov't Code § 2001.035(a)). In exceptional cases, however, an agency may choose to formulate and enforce a general requirement through a decision in a particular case. *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 255 (Tex. 1999). Adjudicative rulemaking has been recognized as appropriate in limited circumstances in which an agency is confronted with (1) an issue of first impression, (2) a new or amended statutory scheme or administrative rules, or (3) an issue that cannot be adequately captured within the bounds of a general rule because the problem is so specialized and varying in nature. None of those circumstances is present in this case.[7] Accordingly, the rule embodied in the reciprocal-sanctions policy is invalid and should not have been applied in Witcher's case. The inclusion of general language in the final order that the sanction imposed "best reflects the Board's determination of the seriousness of the violation and is the best sanction to deter future violations" neither negates the rule's obvious application in Witcher's case nor suggests an alternative basis for the Board's decision. The trial court did not err in reversing the Board's order and remanding the cause to the Board for reconsideration of the appropriate sanction under properly promulgated rules.

---

[7] We are not persuaded by the Board's assertion that Witcher's case presented a novel issue with which the Board was unfamiliar. The case of *In re Nealy*, which references the existence of other cases involving reciprocal sanctions, refutes such a claim, as does Fisher's testimony.

**CONCLUSION**

For the reasons stated, we affirm the trial court's judgment.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Goodwin and Field
  Dissenting Opinion by Justice Goodwin

Affirmed

Filed:   May 3, 2013